IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:25-mj-55 |
| | ) | |
| RAUL HECTOR VASQUEZ-ROBLES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION TO REVOKE RELEASE ORDER**

Raul Hector Vasquez-Robles is not an unmitigable flight risk or danger to the community. Mr. Vasquez-Robles came to the United States in 2000 after his son was born. He admitted this to an Immigration and Customs Enforcement (ICE) agent in a post-arrest interview where he answered all of the agent's questions and cooperated fully. After living in North Carolina for several years, Mr. Vasquez-Robles came to the Eastern District of Virginia about a decade ago in search of better job opportunities so that he could support his family. His criminal history is minimal. His ties to Mexico are nonexistent. His hard work has earned him a dedicated group of supporters and friends in Portsmouth, who hope that he will get out on bond so that he can finish the construction projects he has started for them. Multiple of these people say that Mr. Vasquez-Robles showed up on time when he was supposed to; one person remarked that she knows she could call him at any time to ask for his help and he would do it. Another person stated that Mr. Vasquez-Robles poses no threat of danger.

After carefully considering the evidence during the detention hearing, United States Magistrate Judge Lawrence Leonard agreed with these individuals, finding that Mr. Vasquez-Robles is not an unmitigable flight risk or danger to the community. So, Magistrate Judge Leonard ordered the person's release as required by the Bail Reform Act and set out his findings in a

thorough memorandum opinion and order. ECF No. 16. Notably, Magistrate Judge Leonard ordered multiple restrictive conditions of release that exceeded those that were recommended in the Pretrial Services Report (which also recommended release). ECF No. 10, at 4. Among the standard conditions, Magistrate Judge Leonard's conditions of release also include a third-party custodian, electronic monitoring, a curfew, and a travel restriction. ECF No. 16, at 13. These are incredibly restrictive conditions that can reasonably assure the appearance of Mr. Vasquez-Robles as required and the safety of the community.

Accordingly, this Court should not revoke the release order. The government has not shown that these restrictive conditions of release cannot reasonably assure the appearance of Mr. Vasquez-Robles as required and the safety of the community.

**ARGUMENT**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act provides those limited exceptions. Because the government failed to meet its heavy burden of showing that no combination of release conditions would reasonably assure the safety of the community and Mr. Vasquez-Robles's appearance as directed, the Court should grant his release.

In determining whether any conditions of release would reasonably assure the appearance of the person as required and the safety of the community, the court must consider four factors: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). As the magistrate judge correctly found, these factors together did not

demonstrate that no conditions of release could reasonably assure the appearance of the person as required and the safety of the community. ECF No. 16, at 5; 18 U.S.C. § 3142(g).

## I. The nature and circumstances of the offense strongly favor pretrial release.

First, the nature and circumstances of the offense charged weigh strongly in favor of release. Mr. Vasquez-Robles is charged with illegal reentry in violation of 8 U.S.C. § 1326(a). It is beyond dispute that this offense does not fall within any of the categories of serious offenses enumerated in § 3142(g)(1). Nor is it even one of the offenses that categorically entitles the government to a detention hearing under § 3142(f)(2). Illegal reentry is a regulatory offense that involves no victim or weapon.

Similarly, the seriousness of the penalty faced, if convicted, also does not create a serious risk that Mr. Vasquez-Robles will attempt to flee if released on bond. Although the offense charged is a felony, Mr. Vasquez-Robles faces a maximum of only two years on prison. 8 U.S.C. § 1326(a). Mr. Vasquez-Robles is not charged with any of the sentencing enhancements under 8 U.S.C. § 1326(b) that would raise the statutory maximum penalty. His base offense level under the guidelines will likely be 8; it does not appear that any of the specific offense enhancements in the guidelines will apply here. *See* U.S.S.G. § 2L1.2(a). If he were to plead guilty and accept responsibility, his offense level would be only 6. This shows that the nature and circumstances of the offense are among the least serious in the federal system. *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (affirming order releasing defendant under BRA and noting that "illegal reentry is a nonviolent crime" which, in that case, "appear[ed] to carry with it a relatively low penalty"). This factor strongly favors release. With these guidelines and this statutory maximum, it seems unlikely that the government would even be seeking detention if not for Mr. Vasquez-Robles's citizenship status.

Still, the government argues that this factor favors detention based on the presence of the ICE detainer and the underlying facts concerning the Chesapeake traffic stop. However, these arguments are unavailing.

First, the government cannot rely on the presence of the ICE detainer to deny Mr. Vasquez-Robles pretrial release. The detainer says on its face that this "detainer arises from DHS authorities and should not impact decisions about the alien's bail." DHS Form I-247A (emphasis added).[1]

Moreover, as Magistrate Judge Leonard explained, courts have held that the presence of an ICE detainer and the possibility of removal alone do not show that a defendant is unlikely to appear. *See United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015) (holding that a district court erred in relying on the existence of an ICE detainer and the probability of immigration detention and removal to find that no conditions or combination of conditions will reasonably assure a defendant's appearance). The Bail Reform Act demands an individualized analysis of the § 3142(g) factors to determine whether a defendant should be released on bond prior to trial. *See id.* ("The court may not [ ] substitute a categorical denial of bail for the individualized evaluation required by the Bail Reform Act").

The government's decision regarding removal is not an indicator of nonappearance under the Bail Reform Act; "as a number of district courts have persuasively explained, the risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition." *Santos-Flores*, 794 F. 3d at 1091. If the government, by placing a defendant in immigration detention or removing him, jeopardizes the district court's ability to try him, then the district court may craft

[1] Available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf (last accessed April 8, 2025).

an appropriate remedy. *Id.* "The court may not, however, substitute a categorical denial of bail for the individualized evaluation required by the Bail Reform Act." *Id.* at 1091–92.

Because § 3142(g) demands an individualized analysis, courts cannot categorically deny bond to removable aliens solely on the basis of their immigration status or the existence of an immigration detainer. *See United States v. Sanchez-Rivas*, 752 F. App'x 601, 604 (10th Cir. 2018) (holding that defendant "cannot be detained solely because he is a removable alien"); *Santos-Flores*, 794 F.3d at 1092 ("We conclude that the district court erred in relying on the existence of an ICE detainer and the probability of Santos–Flores's immigration detention and removal from the United States to find that no condition or combination of conditions will reasonably assure Santos-Flores's appearance pursuant to 18 U.S.C. § 3142(e)."); *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111 (D. Minn. 2009) (concluding that the mere presence of an ICE detainer does not override Congress' detention plan in § 3142(g)); *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962, 968 (E.D. Wis. 2008) ("[I]t would be improper to consider only defendant's immigration status, to the exclusion of the § 3142(g) factors, as the government suggests.").

The Executive Branch's Department of Justice should not be able to threaten that, if this Court follows the law under the Bail Reform Act, another arm of the Executive Branch (ICE/DHS) will cause the defendant not to be available for trial. If this Court orders release under the Bail Reform Act and the Executive Branch chooses to prioritize Mr. Vasquez-Robles's removal over this prosecution, it is free to do so by dismissing this case and processing Mr. Vasquez-Robles for removal. But the Executive cannot hold the courts and Mr. Vasquez-Robles hostage over the prospect that it may make such a choice. *See United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1180 (D. Or. 2012) ("[I]f the Executive Branch chooses to forgo criminal prosecution of Mr.

Alvarez-Trujillo on the pending charge of illegal reentry and deport him from the United States, as previously stated, there is nothing further for this Court to do.").

It is beyond peradventure that the Bail Reform Act's standard provisions apply to cases involving aliens. Section 3142(d)(1)(B) provides for the temporary detention of removable aliens "for a period of not more than ten days" if the court finds that the individual may flee or poses a danger to any other person or the community. 18 U.S.C. § 3142(d). If the court fails to make such a finding, the court must treat the individual in accordance with the other provisions of the BRA. 18 U.S.C. § 3142(d)(2). Likewise, if DHS "fails or declines to take such person into custody during that [ten-day temporary detention] period, such person shall be treated in accordance with the other provisions of [the Bail Reform Act]." § 3142(d)(2). The other provisions of the BRA require release unless the government meets its heavy burden of showing the person presents an unmitigatable risk of flight. Accordingly, § 3142(d) explicitly makes removable aliens subject to the BRA's general standard for pretrial release and therefore implicitly authorizes their release on bond.

As the Tenth Circuit has observed, "although Congress established a rebuttable presumption that certain defendants should be detained, it did not include removable aliens on that list." *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338 (10th Cir. 2017). Thus, Congress knew how to identify cases in which grounds for detention are intrinsic to the alleged offense. We also know that Congress explicitly contemplated the Bail Reform Act applying to non-citizen, non-LPRs who may be subject to detention by ICE. *See* § 3142(d). So merely pointing to the defendant's status as a non-citizen, to his alleged removability, or to his generic ties to a foreign country cannot be enough for the government to meet its burden of proving that no condition will "reasonably assure the appearance of the person as required." § 3142(e)(1). Indeed, if the only

evidence of the defendant's flight risk consists of his foreign citizenship, immigration status, and the offense charged—even if the defense presents no evidence mitigating the risk of non-appearance—the person should be released. Otherwise, the Court will have found that facts intrinsic to the offense are sufficient to justify detention in the absence of some proof by the defense. That is the equivalent to a rebuttable presumption of detention for illegal reentry offenses, which Congress could have but affirmatively chose not to create. Accordingly, the Court should reject the government's argument; the ICE detainer does not support detention.

Next, the government relies on the circumstances surrounding the Chesapeake traffic stop on February 2, 2025. ECF No. 15, at 5. The government did not call the officers as witnesses during the detention hearing, relying instead on the police report. The police report states that Mr. Vasquez-Robles falsely identified himself to Chesapeake Police during the traffic stop. Then, after Mr. Vasquez-Robles apparently consented to a search of his car, officers discovered what they suspected to be "a small quantity of 'crack' cocaine on the floor of the vehicle." *Id.* Purportedly, the officers also found two items of drug paraphernalia—a pipe and a push rod. However, the drug charge was ultimately *nolle prossed*, thus seemingly suggesting that the substance was not ultimately a controlled substance, that there were weaknesses or constitutional issues in the case, or that the Commonwealth did not deem the offense serious enough to pursue it.

Furthermore, the government puts undue weight on the false identification issue for which Mr. Vasquez-Robles received a time-served sentence. This is not enough to show that conditions of release cannot reasonably assure Mr. Vasquez-Robles's appearance as required. *See United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986) ("[The defendant] is clearly capable of obtaining false identification, but there is no direct evidence to suggest that he would flee from prosecution in the future."). The government states that Mr. Vasquez-Robles had a wallet full of "numerous

names printed on various cards." ECF No. 15, at 2. The government equates this with the use of false government issued identification to try to show that Mr. Vasquez-Robles poses a flight risk. *Id.* at 5. But Magistrate Judge Leonard asked the government about this during the detention hearing, trying to determine whether these cards where false identification documents or just business cards of friends. The government answered that they were business cards. As Magistrate Judge Leonard remarked during the hearing, several people in the courtroom during the detention hearing likely had wallets full of business cards. The Court should not credit this argument from the government. Moreover, even if they were false identification cards, that would not mean that Mr. Vasquez-Robles is an unmitigable flight risk. *See Himler*, 797 F.2d at 162.

      This is not sufficient to show that any risk of flight cannot be addressed by conditions of release, like those imposed by Magistrate Judge Leonard. This is especially true considering Mr. Vasquez-Robles's subsequent cooperation with the ICE agent during the post-arrest interview, where Mr. Vasquez-Robles cooperated fully. Agent Hamilton told Mr. Vasquez-Robles he had the right to remain silent and the right to an attorney. But still, Mr. Vasquez-Robles talked to the agent. Agent Hamilton told Mr. Vasquez-Robles that he was with ICE. And in the face of this agent who directly controlled Mr. Vasquez-Robles's immigration fate, Mr. Vasquez-Robles freely told the agent that he had been removed from the United States before, and that he reentered the United States 25 years ago, after his son was born. When the ICE agent asked him to provide his fingerprints and photograph, Mr. Vasquez-Robles complied. As the ICE agent himself admitted during the detention hearing, Mr. Vasquez-Robles was polite and cooperative.

      Accordingly, the nature and circumstances of the offense strongly favor release here.

## II. The weight of the evidence likely favors the government, but the Court should not give this factor too much weight.

Next, the second (g) factor, concerning the weight of the evidence, likely weighs against Mr. Vasquez-Robles. But in large part, this is because of his cooperation during the interview with the ICE agent, where Mr. Vasquez-Robles agreed to talk to the ICE agent, admitted to several elements of the offense, and agreed to provide fingerprints and a photograph when asked. But at any rate, this Court should not place too much emphasis on the weight of the evidence because doing so is akin to applying a presumption of guilt, which is expressly forbidden under § 3142(j). As courts have recognized, this factor should be treated as the "least important" of the § 3142(g) factors. *See United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); *United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008) ("Courts generally consider the Weight Factor as the 'least important' of the Factors."). Thus, this factor likely weighs in favor of detention, but it should not be given too much weight.

## III. The history and characteristics of Mr. Vasquez-Robles support release as he has strong community ties to the area where he has resided for many years and he has minimal criminal history.

Third, the history and characteristics of Mr. Vasquez-Robles support release as they show that he is not an unmitigable flight risk. Under this factor, courts consider: "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

These considerations support pretrial release here. Mr. Vasquez-Robles has resided in the community for a long time—about a decade here in the Eastern District of Virginia. ECF No. 10, at 1. He came to this region in search of better job opportunities to support his family. He entered the country 25 years ago after his son was born.

The government contends that Mr. Vasquez-Robles lacks family ties to the area, which show that he is likely to flee. ECF No. 15, at 6. While it is true that his family does not reside in the Eastern District of Virginia, they are still close geographically—only a few hours away. Mr. Vasquez-Robles's sister, son, and step-daughter all live in North Carolina. They live close enough that they could drive up to visit him in Portsmouth if he were released on bond. And Mr. Vasquez-Robles's son reports that his dad was always present for important events growing up.

Regardless, Mr. Vasquez-Robles still has strong ties to Portsmouth. As the bond report notes, the defendant's girlfriend of many years lives in Portsmouth. ECF No. 10, at 1. And moreover, Mr. Vasquez-Robles's hard work and kindness has earned him a dedicated group of supporters and friends in Portsmouth who rely on him. Over the past few years, Mr. Vasquez-Robles has been doing construction and handyman work in Portsmouth. The people for whom he has worked speak highly of him. They all hope that he will get bond so that he can finish the projects that he has started. Multiple of these people gladly call Mr. Vasquez-Robles their friend now too, like his third-party custodian who has known him for about five years. These individuals say that he is hardworking and does quality work. Multiple of them said that he showed up when he said he would, and that they would recommend him to others needing work.

Next, Mr. Vasquez-Robles has minimal criminal history as noted in the bond report. ECF No. 10, at 3. During the detention hearing, the government claimed to have found additional charges in North Carolina, the most recent of which was 10 years ago. They are not mentioned in the bond report, nor has the government provided any evidence of these convictions to defense counsel yet. Their dispositions are unknown. ECF No. 16, at 12. But regardless, these charges all seem to have been misdemeanors; Agent Hamilton said that the charges were for driving under the influence, driving on a revoked or suspended license, and an open container violation. *Id.* at 4.

Even assuming that all of these charges resulted in convictions, the government cannot seriously contend that this criminal history shows that Mr. Vasquez-Robles is an unmitigable flight risk. Mr. Vasquez-Robles's criminal history is minimal; it clearly favors pretrial release on conditions.

The government also suggests here that Mr. Vasquez-Robles's immigration status suggests that Mr. Vasquez-Robles is likely to flee. ECF No. 15, at 6. However, the government's own statistics concerning undocumented citizens undercuts its argument. During the hearing, the defense offered a study by the Department of Justice itself that provided illuminating statistics regarding the rate that noncitizens violate conditions of their release and fail to appear. ECF No. 11-4. The statistics show that, overwhelmingly, these individuals abide by their conditions of release and show up when required, as reflected in the following table:

**TABLE 9**
**Defendants released pretrial with cases disposed in federal district courts, by type of release violation and demographic characteristics, FYs 2011–18**

| Demographic characteristic | Number of released defendants | Percent who had— At least one release violation | Failure to appear | Technical violation[a] | Rearrest for new offense[b] | Release revoked |
|---|---|---|---|---|---|---|
| Total | 241,164 | 18.9% | 1.0% | 17.2% | 2.1% | 10.5% |
| **Sex** | | | | | | |
| Male | 178,471 | 19.2% | 1.1% | 17.4% | 2.3% | 10.7% |
| Female | 61,285 | 18.1 | 0.9 | 16.8 | 1.6 | 10.1 |
| **Race** | | | | | | |
| White | 164,189 | 16.5% | 1.0% | 15.2% | 1.7% | 9.6% |
| Black | 56,805 | 25.4 | 1.1 | 22.7 | 3.5 | 12.8 |
| American Indian/ Alaska Native | 6,230 | 35.2 | 1.4 | 32.9 | 3.2 | 23.9 |
| Asian | 7,030 | 12.3 | 0.8 | 11.2 | 1.2 | 5.0 |
| Native Hawaiian/ Other Pacific Islander | 856 | 21.4 | 0.4 ! | 20.9 | 1.1 ! | 10.3 |
| **Ethnicity** | | | | | | |
| Hispanic | 81,572 | 13.8% | 1.3% | 12.6% | 1.3% | 8.3% |
| Non-Hispanic | 151,737 | 21.7 | 0.9 | 19.8 | 2.6 | 11.8 |
| **Citizenship status** | | | | | | |
| U.S. citizen | 195,609 | 21.8% | 0.9% | 20.0% | 2.5% | 12.1% |
| Documented non-U.S. citizen | 13,295 | 15.3 | 3.4 | 12.6 | 1.6 | 9.0 |
| Undocumented non-U.S. citizen | 28,472 | 2.0 | 0.5 | 1.6 | 0.2 | 1.1 |

Note: Sex was missing on 1,408 records, race was missing on 6,054 records, ethnicity was missing on 7,855 records, and citizenship status was missing on 3,788 records. Details may not sum to total due to missing data and because defendants could have more than one type of release violation. Not all violations resulted in revocation of pretrial release.

! Interpret with caution. Estimate is based on 10 or fewer cases.

[a]Includes a failed drug test, failure to maintain employment, and any other violation of conditional release.

[b]Includes felony and misdemeanor offenses.

Source: Bureau of Justice Statistics, based on data from the Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services Automated Case Tracking System, fiscal years 2011–18.

*Id.* at 11 (highlight added). As these statistics from the DOJ itself show, only 0.5% of undocumented non-citizens released pretrial had a failure to appear. *Id.* Only 2% had a violation of any kind. *Id.* So, the DOJ's own study suggests that there are conditions of release that can reasonably assure Mr. Vasquez-Robles's presence as required and the safety of the community.

Accordingly, this factor strongly favors pretrial release.

**IV. Mr. Vasquez-Robles does not pose a danger to any person or the community if he were to be released.**

The government has not argued that Mr. Vasquez-Robles poses any danger to anyone if he were to be released. As Magistrate Judge Leonard stated: "the Government based its argument on the Defendant's risk of nonappearance, not any alleged danger his release would pose to the community." ECF No. 16, at 12. Mr. Vasquez-Robles has minimal criminal history, and the government has not suggested at any point that he poses a danger to anyone. This factor clearly favors release, as Magistrate Judge Leonard found.

**CONCLUSION**

The restrictive conditions of release imposed by Magistrate Judge Leonard will reasonably assure the appearance of Mr. Vasquez-Robles as required and the safety of the community. These restrictive conditions are more than enough to address any concerns about nonappearance. Accordingly, the Court should deny the government's motion to revoke the release order.

Respectfully submitted,

RAUL HECTOR VASQUEZ-ROBLES

By:__________/s/________________

Michael L. Tagliabue
Texas State Bar No. 24138511

Andrew W. Grindrod

        Virginia State Bar No. 83943

        Assistant Federal Public Defenders
        Office of the Federal Public Defender
        500 East Main Street, Suite 500
        Norfolk, Virginia 23510
        (757) 457-0800
        (757) 457-0880 (telefax)
        michael_tagliabue@fd.org
        andrew_grindrod@fd.org